IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: § | | |
| LEIGH CIMAROLLI and § | CASE NO. 04-30507-H2-7 | |
| MARY CIMAROLLI, § | | |
| Debtors § | | |
| § | | |
| § | | |
| WITTIG GRASS SALES, LLC, § | | |
| Plaintiff § | | |
| § | | |
| VS. § | ADVERSARY NO.04-3250 | |
| § | | |
| LEIGH CIMAROLLI and § | | |
| MARY CIMAROLLI, § | | |
| Defendants § | | |

## **MEMORANDUM OPINION IN SUPPORT OF FINAL JUDGMENT**

On March 26, 2004, Plaintiff filed this adversary proceeding seeking a determination that the Debtors' stipulated debt to Plaintiff is non-dischargeable under 11 U.S.C. §§ 523(a)(4) and 523(a)(6). For reasons set forth below and by separate order issued this date, the Court holds that the debt is non-dischargeable under § 523(a)(4). Given the Court's finding on non-dischargeability under § 523(a)(4), the Court need not address Plaintiff's argument for non-dischargeability under § 523(a)(6).

### JURISDICTION

This is an adversary proceeding, a civil proceeding, arising in a case under title 11 and arising under title 11 of the United States Code. The United States District Court has jurisdiction under 28 U.S.C. § 1334(b). By Order dated August 9, 1984, superceded by General Order 2005-6 on March 10, 2005, under authority granted by 28 U.S.C. § 157(a), the United States District Court for the Southern District of Texas referred all such proceedings to the bankruptcy judges for the district. This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(I). The bankruptcy judge may hear and may determine core proceedings, 28 U.S.C. 157(b)(1). No party has objected to the exercise of core jurisdiction by the undersigned bankruptcy judge.

### STIPULATED FACTS

In docket # 35 the parties stipulated that:

1.  At all relevant times to this dispute, Leigh Cimarolli was the sole shareholder and president of

Ryan Landscaping, Inc. ("Ryan").

2. At all relevant times to this dispute, Mary Cimarolli was the chairman of the board and vice president of Ryan and served on Ryan's board of directors.
3. Ryan performed landscaping services pursuant to written agreements with approximately 30 large companies that built subdivisions or tract homes.
4. Witting Grass Sales, L.L.C. ("Plaintiff") furnished grass ("sod") to Ryan for the landscaping of specific real property, as identified by date, property address, invoice number, owner name, quantity and agreed-on prices as shown on Plaintiff's Stipulated Exhibits 1, 2-A, 2-B, 3-A, 3-B, 4-A and 4-B, in connection with Ryan's performance of landscaping services for the home builders during the period between January 1, 2000 and August 31, 2001.
5. Ryan placed written orders with Plaintiff for the delivery of sod to specific property addresses.
6. Ryan received delivery of the Plaintiff's sod in response to the written orders.
7. Ryan agreed to pay Plaintiff for the sod ordered and received.
8. Ryan submitted invoices to the owner of each specific real property addressed on the written orders and included in such invoice amounts covering the cost of the sod furnished by Plaintiff for the sod delivered and Ryan received payment of each such invoice.
9. Plaintiff supplied the sod to Ryan prior to Ryan's receipt of the payments referred to above.
10. Ryan did not pay Plaintiff for the sod identified in the stipulated exhibits within 30 days after Ryan received the payments.
11. The amount due, owing and unpaid to Plaintiff by Ryan is $493,231.96, exclusive of interest.
12. Ryan made payments to the Internal Revenue Service and/or Katy Bank, in payment of tax obligations, in the total amount of $929,736.85, between December 20, 2000 and June 4, 2001.

## ADDITIONAL FINDINGS OF FACT FROM TRIAL

The business practice between Plaintiff and Ryan was that Ryan would fax an order to Plaintiff, noting the amount of sod needed for landscaping a residential property and the address of that residential property. Normally the fax was received the day before the required delivery date. Plaintiff would harvest the sod and deliver it to the location specified in San Antonio, Austin, or Houston. Plaintiff would send an invoice with the driver. Ryan's representative at the building site would sign the invoice on delivery of the sod.

This business relationship begin about 1991. Until about 1999, Ryan paid routinely 30 days after shipment. Occasionally payments were delayed, but not usually.

In 2000, Leigh Cimarolli was actively involved in the stock market as a day trader. In 2001, as the stock market bubble burst, he began to lose substantial amounts of money. Debtors were unable to pay notes on property that they leased to Ryan and increased their personal salaries from Ryan

substantially to make adequate funds available.[1]

About the end of 2000, Ryan began to become more and more late in its payments to Plaintiff. Debtors (through Mary Cimarolli) gave Plaintiff various excuses. Debtors testified that they delayed payments to creditors to finance business expansion without requiring bank loans.

In August, 2001, Plaintiff refused to make further sales to Ryan. Subsequently, Ryan made a few payments on Plaintiff's claim, but did not make all payments agreed to.

Debtors filed bankruptcy proceedings in December, 2003. Immediately prior to that bankruptcy filing, Ryan sold all of its assets to a company known as Terra Nova, which was owned by a third party. Leigh Cimarolli was employed by Terra Nova for a period of about 4 months following the sale. Terra Nova operated out of a building owned by Leigh Cimarolli, a building in which Ryan had previously operated. Subsequent to that sale, Mary Cimarolli was in charge of winding down Ryan's affairs, and she delivered to Terra Nova a number of checks that were payable to Ryan. Ms. Cimarolli was not able to articulate a clear reason why those checks were not made available to Ryan's creditors.

Ryan's business and financial affairs were not carefully monitored and documented. Leigh Cimarolli testified that he was unaware of a number of significant financial transactions and was unaware that the company was in financial straits until the situation was dire. He testified that he did not know that the IRS was not being paid trust fund taxes when they were due, that he did not sell securities to pay IRS debt because he was not aware of it in the beginning,[2] and that when he became aware of the problems it was already a turnaround situation. Mary Cimarolli testified that until they hired a turnaround expert, they had never calculated the cost of each project.

There were at least two sibling companies: Ryan Nursery and Growth Horizons. It was not clear from Debtors' testimony what the objectives and business purposes of these companies were. Nor was there satisfactory evidence about how those companies were capitalized, what assets they held, or what transactions occurred between the companies.

Although both Leigh Cimarolli and Mary Cimarolli testified that all funds that Ryan received

---

[1] The testimony on this subject was not clear. The Debtors testified that they owned land, subject to a mortgage, that they leased the land to Ryan and that payments from Ryan on the lease were erratic. So Debtors allegedly raised their salaries from Ryan so that they would have enough money to pay the note on the property. It is not credible that Ryan had enough money to pay salary increases, and could pay salary regularly at the higher rate, but did not have not enough cash flow to pay rent.

[2] He testified that he was not aware of the IRS problems because Mary Cimarolli was responsible for that part of the business and received that mail.

from its customers were used to pay expenses of the business, that testimony is not credible. It is not credible because the business and financial affairs of the company were so poorly recorded, monitored, and managed that the Court does not believe that they could know where the money went. It is also not credible because (1) Leigh Cimarolli obviously had substantial funds that he used for day trading in the stock market,[3] (2) Debtors had other businesses that they operated without apparent distinction among corporate entities, (3) Debtors substantially raised their salaries at precisely the time that Ryan was most encountering financial difficulty, (4) Debtors incorporated yet another business at precisely the time that Ryan was encountering financial difficulty, and (5) Debtors used payments from customers to "expand" Ryan's business (no explanation of what kinds of expenditures were involved.)

## ANALYSIS

### *Bankruptcy Code Exception to Dischargeability of Debt*

Bankruptcy Code § 523(a)(4) provides that a debt is not dischargeable if the debt arises from "defalcation while acting in a fiduciary capacity ..." "Defalcation refers to a failure to produce funds entrusted to a fiduciary and applies to conduct that does not necessarily reach the level of fraud ...." *Collier on Bankruptcy 15th Ed Rev.*, ¶ 523.10[b]. "[I]f the fiduciary relationship imposes certain obligations on the debtor, and the debtor fails to perform those obligations, then a defalcation will be made out." *In Re Faulkner*, 213 B.R. 660, 664 (Bankr. WD Tex 1997).

### *1997 Amendments to the Texas Property Code*

The Texas Legislature and the Court of Appeals for the Fifth Circuit have had a progression of statutes and interpretations of those statutes relating fiduciary responsibility for payments for real property construction.

The Texas Legislature enacted provisions in the Texas Property Code requiring contractors to treat payments from builders as trust funds held for the benefit of subcontractors, among others, *see* TEX. PROP. CODE, TITLE 10, SUBTITLE B, CHAPTER 162, 163.

In *Boyle v. Abilene Lumber, Inc.*, 819 F.2d 583 (5th Cir. 1987) the court held that a breach of fiduciary responsibility occurred under the statute only if construction trust funds were diverted "with intent to defraud".

So the Texas Legislature amended the statute in 1987 to provide that a breach of fiduciary responsibility occurred if the trustee "<u>intentionally or knowingly</u> or with intent to defraud ..." improperly paid the trust funds.

---

[3] Although Mr. Cimarolli testified that he obtained the funds for stock market trading from real estate sales, that testimony is simply not convincing in light of his inability to remember financial details of other transactions and his failure to maintain adequate financial records for Ryan.

In *In re Nicholas*, 956 F.2d 110 (5th Cir. 1992), the Fifth Circuit held that no breach of fiduciary obligation occurred if the funds were used to pay bills necessary to keep the business operating, even if the trustee paid creditors who were not beneficiaries of the trust fund (*i.e.* were not parties who could lien the construction project), so long as the payments that were made were payments necessary to keep the projects or the company going.

> Under the affirmative defense to the Texas Construction Trust Fund Statute, ... general contractors may use the payments they receive from construction projects to keep those projects going even if, in some instances, the beneficiaries are not paid first. [*Nicholas* at 113.]

In 1997, the Texas Legislature again amended the statute. This time, the statute further requires trustees of trust funds to maintain the trust funds in a separate account and to keep specific records of the account. Failure to maintain the account and the records is statutorily defined to be a breach of fiduciary responsibility. However, this amendment of the statute does not apply to contracts entered into prior to 1997, even if payments on those contracts were made after 1997.

The contracts relevant to this case would be the contracts between Ryan and the home builders. The evidence does not establish whether those contracts were entered into prior to 1997. The only evidence in the record is Exhibit 8, which is a contract entered into in 1996. Neither party has argued that the 1997 amendments control this case.

Therefore, the Court has decided this case under the law as it existed prior to the 1997 amendment, the law interpreted by the Court of Appeal for the Fifth Circuit in *Nicholas*.

*Texas Property Code Section 162.001 – Are payments by the home builders to Ryan trust funds?*

Section 162.001 of the Texas Property Code states

(a) Construction payments are trust funds under this chapter if the payments are made to a contractor or subcontract or to an officer, director, or agent of a contractor or subcontractor, under a construction contract for the improvement of *specific real property* in this state. (emphasis added).

Debtors argue that the written contracts between Ryan and the property owners did not identify specific real property and therefore, the payments received pursuant to the contract are not trust funds". Only one contract, Plaintiff's Exhibit 8, was introduced into evidence; it was introduced as an exemplar of the contracts with roughly 30 contractors. These contracts were "master contracts" that contain general contract provisions and contemplate issuance of work orders from time to time to define the specific homes for which Ryan would provide landscaping. Those work orders were to be considered in "conjunction with" the contractor agreement. Plaintiff's Exhibit 8, paragraph 3.

Testimony was clear that the home builders ordered sod for specific lots and houses as they

were completed, that the contractor defined the amount of sod that would be required or else Ryan would send its employees out to the lot to measure, that Ryan faxed work orders to Plaintiff, that Plaintiff then delivered the sod to the residential lot, and that Ryan representatives signed Plaintiff's invoice at the residential lot when the sod was delivered.

The fact that the "master contract" between Ryan and the home builder did not refer to "specific property" does not mean that the contracts do not relate to "specific property." Work orders, whether verbal or written, referred to specific property. Therefore, the Court concludes that the statute applies.

### *Texas Property Code § 162.002 – Are Debtors trustees and personally liable to Plaintiff?*

A "contractor, subcontractor, or owner or an officer, director or agent of a contractor, subcontractor, or owner, who receives trust funds or who has control or direction of trust funds, is a trustee of the trust funds". Texas Property Code § 162.002. Debtors stipulated that Ryan, through the Debtors, received funds from property owners and that Debtors were officers of Ryan.

It is undisputed that Debtors were the owners and officers of Ryan, in complete control of Ryan and in complete control of what expenditures Ryan made. Therefore the statute applies to them, even though the contract was between Plaintiff and Ryan. *See Lively v. Carpet Services, Inc.*, 904 S.W.2d 868, 873 (Tex.App.– Houston [1st Dist.], 1995), *Nuclear Corporation of America v. Hale*, 355 F.Supp. 193, 197 (N.D. Tex. 1973), *aff'd* 497 F.2d 1045 (5th Cir. 1973) and *Nicholas*.

### *Texas Property Code § 162.003 – Is Plaintiff a beneficiary of the trust funds?*

Plaintiff is a beneficiary of the trust funds received by Debtors because it is a "materialman ... who furnishes ... material for the construction or repair of an improvement on specific real property". Texas Property Code § 162.003.

### *Texas Property Code § 162.031 – Did the Debtors misapply the trust funds?*

Under § 162.031 of the Texas Property Code, a trustee misapplies trust funds when he/she "intentionally or knowingly or with intent to defraud, directly or indirectly retains, uses, disburses, or otherwise diverts trust funds without first fully paying all current or past due obligations incurred by the trustee to the beneficiaries of the trust funds".

Debtors argue that the affirmative defense provided in § 162.031(b) applies to this situation. That subsection provides that

> (b) It is an affirmative defense to prosecution or other action ... that the trust funds not paid to the beneficiaries of the trust were used by the trustee to pay the trustee's actual expenses directly related to the construction or repair expenses directly related to the construction or repair of the improvement ....

Debtors stipulated that they received the funds from the property owners and that they did not pay Plaintiff.  However, Debtors testified and argue that all receipts were used to pay expenses of the business.  As noted above, and for the reasons set forth above, the Court finds that testimony to be not credible.  In particular, the Court notes that Debtors admitted to using trust funds to increase their personal salaries and to expand their business, rather than pay creditors.  Trial transcript, page 52, lines 22 - 25, page 85, lines 8 - 10.

*Plaintiff's Attorney's Fees*

Plaintiff alleges that it "is entitled to recover it's reasonable and necessary attorneys fees and cost for pursuing this action" (doc # 1).  Plaintiff may only recover attorney's fees to the extent authorized by non-bankruptcy law.  *In re Jordan*, 927 F.2d 221, 226-258 (5th Cir. 1991).  In this case, Debtors stipulated to the total amount of the debt.  Accordingly, this adversary proceeding concerned only the dischargeability of that debt.  *See In re Rea*, 245 BR 77, 90 (Bankr. ND Tex 2000) (a party which concedes the debt owed in a dischargeability context is only contesting whether the debt is dischargeable).  The Bankruptcy Code does not provide for attorney's fees for dischargeability complaints.  Absent a specific fee-shifting statute parties must bear their own costs. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 US 240, 249 - 250 (1975).  Therefore, Plaintiff's request for recovery of its attorney's fees is denied.

## CONCLUSION

For reasons stated above and by separate order issued this date, the Court finds that Debtors violated their fiduciary duty under chapter 162 of the Texas Property Code.  Therefore, the debt owed to Plaintiff by Debtors is nondischargeable.

SIGNED   July 11, 2006

_____
WESLEY W. STEEN
UNITED STATES BANKRUPTCY JUDGE